IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY KELLY, | ) | CASE NO. 1:12-cv-00102 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tammy Kelly ("Plaintiff" or "Kelly") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

Kelly filed her application for Disability Insurance Benefits ("DIB") on or about March 16, 2009. Tr. 93-94, 179. The application alleged a disability onset date of March 4, 2008. Tr.179. Plaintiff alleged disability based on back pain, fibromyalgia, depression, lesions on her liver, arthritis, fatigue, and frequent infections. Tr.100, 109, 204. After initial denial by the state agency and after denial upon reconsideration (Tr. 93-94, 99-115), Kelly requested a hearing (Tr.116), and an administrative hearing was held before Administrative Law Judge Kendra S. Kleber ("ALJ") on August 3, 2011. Tr. 28-92.

In her September 8, 2011, decision (Tr. 7-27) the ALJ determined that Kelly had not been under a disability from March 4, 2008 through the date of the ALJ's decision. Tr. 21. Kelly requested review of the ALJ's decision by the Appeals Council. Tr. 5-6. On November 16, 2011, the Appeals Council denied Kelly's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence[1]

### A.    Personal and Vocational Evidence

At the time of the hearing, Kelly was 46 years old and had last worked in March of 2009 as an administrative assistant. Tr. 38-41. She had substantial gainful activity earnings in 2008 and 2009, and she received unemployment compensation payments during part of 2009, 2010 and part of 2011. Tr. 12. Plaintiff is divorced and has no children. Tr. 613.

### B.    Medical Evidence

#### 1.  Northeast Ohio Vascular Associates, Inc.

In 2006, Kelly received treatment for symptomatic varicose veins that were causing her legs to ache and throb. Tr. 355-358. Following surgical intervention for the varicose veins, Kelly reported that she was doing great and pleased with the results. Tr. 357. To eliminate any remaining symptomatic varices, physicians with Northeast Ohio Vascular Associates, Inc. recommended follow up compression sclerotherapy treatments. Tr. 356-358. Although her doctor prescribed T.E.D. hose to increase her circulation in her legs Kelly testified that use of the hose made her numbness worse. Tr. 82-83.

---

[1] Although Plaintiff alleged disability based on mental impairments, her claims in this appeal relate only to her physical impairments. Thus, the summary of evidence relates primarily to her physical impairments.

## 2.  Dr. Randy D. Trice, D.C.

In 2004 and in 2006, Kelly was receiving chiropractic treatments.  Tr. 376, 411-429.  On or about October 7, 2006, Kelly was in a motor vehicle accident and she continued chiropractic treatments with Dr. Trice.[2]  Tr. 360-395.  Following a series of chiropractic treatment, on November 15, 2006, Dr. Trice indicated that Kelly arrived at his office reporting that she felt pretty good and was ready for a re-evaluation.  Tr. 360.  Upon re-evaluation, Dr. Trice determined that Kelly's range of motion of the cervical spine was within normal limits, her muscle strength in her upper extremities was normal, and she had some mild lower back and lower thoracic area pain but no muscle weakness.  Tr. 360.  Kelly continued to have achiness in her lower back but it had greatly improved.  Tr. 360.  Based on his re-evaluation of Kelly, Dr. Trice opined that she had reached maximal medical improvement and he dismissed Kelly from his active care.  Tr. 360.  He recommended that Kelly continue care on an as needed basis for recurring symptomatology.  Tr. 360.  He indicated that Kelly had "made significant improvement, obtaining progressive, general relief of symptoms."  Tr. 361.  In 2007, Kelly received further chiropractic treatments from Dr. Trice for complaints of stiffness, soreness and achiness in her neck, upper back, and lower back.  Tr. 401-405.

On April 24, 2009, Dr. Trice completed a report for the Bureau of Disability Determination.  Tr. 396-398.  Dr. Thrice reported that he last treated Kelly on October 3, 2007.  Tr. 398.  He reported that Kelly would benefit from further treatment but indicated that Kelly had discontinued treatment.  Tr. 398.  He also indicated that Kelly's weight and lack of exercise interfered with her treatment.  Tr. 398.  He opined that Kelly would be limited to sitting 4 hours per day for 20-30 minutes at a time; standing 4 to 6 hours per day for 30-45 minutes at a time;

---

[2] X-rays taken on October 7, 2006, showed normal examinations of the right and left knees.  Tr. 597-598.

and walking 2 to 3 hours per day for 15-20 minutes at a time.  Tr. 398.  He also opined that Kelly could bend, stoop and grasp but that she should avoid repetitive bending and she should limit lifting and carrying to 5-10 pounds frequently and to a maximum of 20 pounds.  Tr. 398.

### 3.  Dr. Bruce Piszel, M.D.

On October 30, 2008, Dr. Bruce Piszel, M.D., performed a diagnostic medial branch block under fluoroscopic guidance in Kelly's thoracic/lumbar spine.  Tr. 519-522.  Dr. Piszel indicated that Kelly had a history of lumbrosacral spondylosis without myelopathy.  Tr. 522. Kelly tolerated the procedure well and was sent home with a pain diary.  Tr. 522.

On April 15, 2009, Dr. Piszel examined Kelly.  Tr. 608-611.  Kelly's chief complaint was back pain.  Tr. 608.  Kelly was in no acute distress, her gait was within normal limits, there was no cyanosis, edema or clubbing in her extremities, and her pulses in her extremities were full and normal.  Tr. 609.  She reported her pain as tingling with her pain level at an 8.  Tr. 608.  No supportive devices, i.e., cane/walker, were noted.  Tr. 608.  Kelly exhibited some decreased range of motion and tenderness in her lumbo-sacral area.  Tr. 609-610.  Dr. Piszel diagnosed lumbar spondylosis, neuritis thoracic or lumbosacral and post laminectomy lumbar region and he recommended follow-up in 8 weeks.  Tr. 610.

Kelly saw Dr. Piszel again on July 8, 2009.  Tr. 655-657. Again, no supportive devices were noted.  Tr. 655.  Kelly reported sharp pain with a pain level of 7-8.  Tr. 655.  Kelly saw Dr. Piszel again on September 9, 2009.  Tr. 658-660.  She reported her pain as dull with a pain level of 5.  Tr. 658.  Again, no supportive devices were noted.  Tr. 658.  An MRI was ordered to evaluate for a herniated disc.  Tr. 660.  The MRI did not show a herniated disc.  Tr. 688-689. During a December 10, 2009, visit, Kelly reported her pain as dull with a pain level of 9.  Tr. 661.  She was in no acute distress and no supportive devices were noted.  Tr. 661-662.

Kelly did not see Dr. Piszel again until September 2, 2010.  Tr. 796-798.  She reported a new injury to her right foot.  Tr. 796.  She indicated that she had been sitting down and her feet and legs went numb; she tried to get up and her right foot broke because it was caught under a vanity.  Tr. 796.  She returned to see Dr. Piszel on January 6, 2011, and received a refill of pain medication. 793-795.  A month later, on February 3, 2011, Plaintiff presented to the emergency room stating that she ran out of pain medication and was having muscle spasms and pain.  Tr. 823.  Her pain was generalized and moderate.  Tr. 825.  Treatment notes indicate that the pain symptoms were worsened by narcotics withdrawal.  Tr. 825, 826.  Kelly was discharged with prescriptions for pain medication.  Tr. 827.   Another month later, on March 14, 2011, Kelly returned to Dr. Piszel and reported 75% relief with the then current regimen.  Tr. 792.  Dr. Piszel prescribed additional pain medication.  Tr. 791-792.  Another month later, on April 11, 2011, Kelly again presented to the emergency and reported that she ran out of medication.  Tr. 778.  She reported spasms all over her body and she was in moderate distress.  Tr. 778.  However, she reported no difficulty walking and no numbness or weakness.  Tr. 778-779.  The emergency room physician prescribed pain medications and discharged Plaintiff.  Tr. 782-785.

On June 9, 2011, Kelly saw Dr. Piszel.  Tr. 787.  Again, no supportive devices were noted. Tr. 787.  Plaintiff reported that her pain was sharp, dull, stabbing, and throbbing and that her pain level was at a 6 with medication.  Tr. 787.  Dr. Piszel recommended that Kelly continue with the then current regimen.  Tr. 787-789.

### 4.  Dr. Gary R. Kutsikovich, M.D.

On October 9, 2009, Kelly was seen by Dr. Kutsikovich for a neurology consultation and he provided a report to Dr. Piszel.  Tr. 645-646.  Dr. Kutsikovich reported that Kelly had radicular neck and back pain as well as a history of fibromyalgia, motor vehicle accidents and

back surgery.  Tr. 645.  He agreed with Dr. Piszel that an MRI should be obtained to determine the degree of spondylosis in light of Kelly's history of back surgery.  Tr. 645.  Following the diagnostic testing, Dr. Kutsikovich reviewed the results, examined Kelly and issued a neurology follow-up note.  Tr. 642.  He reported that the MRI of the cervical spine did show mild disc bulging at the C4-C5, C5-C6 and C6-C7 levels but without significant spinal stenosis.  Tr. 642. He further indicated that "[i]t appears that her primary symptoms are secondary to fibromyalgia given the lack of any significant spinal stenosis."  Tr. 642.

### 5.  Dr. William Bolz, M.D. – State Agency Reviewing Physician

On September 23, 2009, Dr. William Bolz, M.D., reviewed the evidence relating to Plaintiff's allegations that her back pain, fibromyalgia, lesions on liver and fatigue prevent her from working.  Tr. 638.  He opined that, although there is some back pain, her condition does not cause any significant limitation on her daily activities and the medical findings show that Plaintiff can move about and that there is no muscle weakness or nerve damage to prevent her from working.  Tr. 638.

### 6.  Diagnostic Tests

On April 16, 2008, an ultrasound to examine the deep venous system of Plaintiff's lower extremities was performed because of reports of leg pain and leg swelling.  Tr. 468.  The result was "normal bilateral leg Doppler ultrasound."[3]  Tr. 468, 547.  There was no evidence of deep venous thrombosis.  Tr. 468, 547.

On October 13, 2009,  a spinal lumbar MRI showed mild central spinal stenosis secondary to bulging discs and mild encroachment of bilateral neural foramina but no herniated lumbar disc.  Tr. 688-689.  On October 13, 2009, a spinal cervical MRI showed mild foraminal

---

[3] Also, because of reports of pain and numbness, on December 30, 2005, an ultrasound was performed and revealed no evidence of left leg deep venous thrombosis.  Tr. 600.

encroachment due to degenerative changes and mild ventral indentations due to disc and osteophyte complexes without significant central spinal stenosis.  Tr. 690.  On October 13, 2009, a spine thoracic MRI showed mild degenerative changes of the lower thoracic spine with accompanying mild volume loss of the lower thoracic vertebral bodies.  Tr. 692.

On August 17, 2010, an x-ray was taken of Plaintiff's right foot.  Tr. 673.  The x-ray showed a "normal right foot" with no evidence of a fracture or joint space narrowing, no soft tissue abnormality and that Kelly's bones were well mineralized.  Tr. 673.

**C.      Testimonial Evidence**

**1.        Kelly's Testimony**

Kelly was represented by counsel and testified at the administrative hearing.  Tr. 38-46, 53-85, 88.  She last worked in March of 2009 as an administrative assistant.  Tr. 39-41.  She offered contradictory testimony regarding the reason for her termination in 2009.  Tr. 41-43.  She initially indicated that she was let go from her position because of excessive absenteeism (Tr. 41, 82) but then indicated that her employer stated that her position was eliminated as part of an effort to downsize (Tr. 42).[4]

She stated that she chose March 4, 2008, as her alleged disability onset date because that was when she went to the emergency room with chest pains and was diagnosed with pneumonia and when lesions were found on her liver.  Tr. 42.  She reported that, after that, "it just seemed like everything was [on] a downhill slide."  Tr. 42.

Kelly testified that she is unable to work because of her constant pain.  Tr. 43.  Her legs go numb after about 10 or 15 minutes of sitting and after about walking 50 feet or so; she cannot always get out bed in the morning because of the pain; and she is unable to sleep at night because of the pain.  Tr. 43, 84.  Her pain is a chronic dull pain and she usually feels the pain in her back.

---

[4] Kelly testified that she had missed 68 days in one year.  Tr. 82.

Tr. 77.  Also, sometimes her arms and fingers tingle and go numb and it is difficult for her to hold on to items.  Tr. 78.  She takes pain medication and that "takes the edge off" but, even with the medication, she still has some pain.  Tr. 43.  She also takes muscle relaxers.  Tr. 58.  With medication, she gets about 2 to 3 hours of sleep per night and her pain level is between a 7 and 8.  Tr. 44, 58-59.  Without medication, her pain level would be well over a 10.  Tr. 44.  She indicated that the medication that she takes makes her really groggy to the point that she cannot even concentrate on a television program or on reading a newspaper or magazine.  Tr. 72-73.  The medication also causes her to be nauseous (Tr. 73) and her vision to be blurry (Tr. 72).

She stated that she had been using a cane since June or July or 2008 and that she wears a boot on her left foot.  Tr. 45.  Also, when at the grocery store, she uses a motorized scooter.  Tr. 45-46.  The scooter had been used by her father before he passed away.  Tr. 45.  She has seen a chiropractor for her pain but has been unable to continue treatments because of her inability to pay for the treatments.  Tr. 61-62.  After sitting for a period of time, her legs go numb and sometimes, when she thereafter tries to walk, her legs give way and she falls.  Tr. 63.   Kelly testified that, a year prior, she had broken her foot as a result of her legs being numb and falling but she could not identify medical records to support the fall.  Tr. 63-68.   Her counsel indicated that there were records showing reports of radiation and tingling down both legs.  Tr. 67-68.  She also reported a more recent fall that involved her falling into a glass table but she indicated that medical attention was not required.  Tr. 67.

Kelly can take care of some day-to-day chores but she receives assistance from her mom, brother and niece with cleaning and cooking.  Tr. 75-76.  She drives, but rarely, because she is concerned about driving with blurred vision.  Tr. 72, 76.

Until a few years prior to the hearing, Kelly had taken care of her mother and father but she was unable to continue to take care of them due to her physical problems so her mom moved in with her sister and her dad was placed in a nursing home.  Tr. 80-81.  She visits with her sister and mom at her sister's house and occasionally her mom will stay with Kelly for a few days.  Tr. 81.

### 2.      Medical Expert Testimony

Dr. Herschel Goren, M.D., testified as a medical expert at the hearing.  Tr. 46-57, 85-86. Dr. Goren indicated that Plaintiff has severe impairments of cervical and lumbar spine pain caused by spinal arthritis or spinal disc degeneration, depressive disorder not otherwise specified, and panic attacks.  Tr. 47, 50.  He indicated that Kelly talked about her multiple sclerosis (MS) but he did not locate records regarding her MS.[5]  Tr. 47.  He also stated that Kelly talked about having fibromyalgia.  Tr. 47-48.  However, he noted that, if she has fibromyalgia, any spinal diagnosis is invalid because fibromyalgia, by definition, is a diagnosis of exclusion, i.e., per Dr. Goren, Kelly cannot have another pain-causing condition and fibromyalgia simultaneously.  Tr. 47-48, 53.  He agreed that Kelly's medical records show a cyst on her liver but he did not see any evidence of impairment of the liver function.  Tr. 48.

Dr. Goren opined that none of Kelly's impairments or combination of impairments meet or medically equal a Listing.[6] Tr. 48.  He considered Listings 1.04 (considered for cervical and

---

[5] Upon further inquiry by the ALJ, Plaintiff and her counsel indicated that the original MS diagnosis was at least 20 years ago and therefore was not in the medical records but also indicated that there are references in medical records to her MS.  Tr. 48-50.

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

back pain), 12.04 (considered for depressive disorder) and 12.06 (considered for panic attacks).
Tr. 47-48.

Based on the impairments identified by Dr. Goren, he opined that Kelly would be limited
to lifting or carrying 20 pounds occasionally and 10 pounds frequently; never climbing ladders,
ropes or scaffolds; occasionally climbing ramps or stairs; occasionally stooping, kneeling,
crouching, and crawling; no exposure to unprotected heights; no standing, sitting or walking
restrictions; and no high production quotas. i.e., no assembly line work or work at which Plaintiff
would be paid at a piece rate.  Tr. 52.   He noted that, if Plaintiff does in fact have fibromyalgia,
there would be no physical restrictions because treatment for fibromyalgia is exercise.  Tr. 53-54.
He also indicated that, while numbness in her feet would interfere with her ability to keyboard
with her toes, it would not prevent her from sitting, standing or walking.  Tr. 56-57.

### 3.      Vocational Expert's Testimony

Vocational Expert Ted Macy ("VE") testified at the hearing.  Tr. 86-92.    The VE
described Kelly's work history over the past 15 years.  Tr. 87-88.  He indicated that she worked
as: a full charge accounting clerk (sedentary skilled job - SVP 6); an accounting clerk (sedentary
skilled job – SVP 5); and an owner of a soda fountain pharmacy doing all aspects of
owning/operating the business (medium skilled job – SVP 7).[7]  Tr. 87-88.

The ALJ asked the VE to assume a hypothetical individual of the same age, education
and past relevant work experience as Plaintiff with the following limitations or restrictions: able
to lift no more than 20 pounds occasionally or 10 pounds frequently; able to stand or walk for 6
out of 8 hours or sit for 6 out of 8 hours; can occasionally climb stairs or ramps but unable to

---

[7] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the
skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-
skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

climb ladders or scaffolds; can occasionally stoop, kneel, crouch or crawl; must avoid exposure to hazards such as unprotected heights or industrial machinery; and limited to work that is low stress, defined specifically as not involving quotas or production line, or resolving conflicts or enforcing rules or demands on others.  Tr. 88-89.  The ALJ then asked the VE whether such an individual would be able to perform the Plaintiff's past relevant work.  Tr. 89.  The VE indicated that, because of the non-exertional limitations, such an individual would be unable to perform Plaintiff's past relevant work.  Tr. 89-90.  However, the VE indicated that there is other work that such an individual would be able to perform including bench assembler (light unskilled job with 800 jobs available locally and 110,000 available nationally); wire worker (light unskilled job with 750 jobs available locally and 105,000 available nationally) and bench hand (sedentary unskilled job with 650 jobs available locally and 95,000 jobs available nationally).  Tr. 90-91.  The VE also testified that, if such an individual was missing one to two days every week, that individual would be unable to sustain the listed jobs.  Tr. 91.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

11

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her September 8, 2011, decision, the ALJ made the following findings:

1.     Kelly meets the insured status requirements through December 31, 2014. Tr. 12.

2.    Kelly engaged in substantial gainful activity during the periods 2008 and 2009. Tr. 12-13.

3.    Kelly has severe impairments of multiple bulging discs of the cervical spine, multiple sclerosis ("MS"), obesity and depression and non-severe impairments of agoraphobia, fatigue, liver lesions and panic attacks. Tr. 13-14.

4.    Kelly does not have an impairment or combination of impairments that meets or medically equals a Listing. Tr. 14-15.

5.    Kelly has the residual functional capacity ("RFC") to perform a limited range of light work because her body habitus, back pain and limitations from MS. She can lift and carry 10 pounds frequently and 20 pounds occasionally. She can stand or walk for 6 hours in an 8 hour workday and sit for 6 hours in an 8 hour workday. She can occasionally climb stairs or ramps, stoop, kneel, crouch or crawl. She cannot climb ladders or scaffolds. She cannot work in a job that exposes her to hazards such as unprotected heights, because obesity and back pain would make it difficult and dangerous for her to rescue herself if necessary. Because of depression, the work needs to be low stress, defined as not including quotas or a production rate pace, or resolving conflicts or enforcing rules on others. Tr. 15-19.

6.    Kelly is unable to perform past relevant work because the exertional requirements of her past jobs exceed her RFC. Tr. 19.

7.    Kelly was born on January 14, 1965, and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 20.

8.    Kelly has at least a high school education and is able to communicate in English. Tr. 20.

9.    Transferability of job skills is not material to the determination of disability. Tr. 20.

10.    Considering Kelly's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that she can perform including bench assembler, wire worker and bench hand. Tr. 20-21.

Based on the foregoing, the ALJ determined that Kelly had not been under a disability from March 4, 2008, the alleged onset date through the date of the ALJ's decision. Tr. 21.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

First, Kelly argues that the ALJ erred at Steps Two, Three and Four by failing to take into account her lumbar spine impairment and resulting back pain.  Doc. 19, pp. 7-13.  Kelly asserts that the ALJ erred by not concluding that her lumbar back impairment and pain were severe impairments at Step Two.  Doc. 19, pp. 9-10.  She argues that the ALJ erred in not specifically addressing her back impairment under Listing 1.04(C) at Step Three.  Doc. 19, pp. 10-11.  She also argues that it is unclear whether the ALJ's RFC determination accounted for limitations resulting from Plaintiff's back impairment and pain.  Doc. 19, pp. 12-13.

Second, Kelly argues that the ALJ failed to properly assess her credibility.  Doc. 19, pp. 13-16.  She asserts that the ALJ did not follow the requirements of 20 C.F.R. § 404.1529 and Social Security Ruling 96–7p when assessing her credibility and simply used boilerplate language.  Doc. 19, pp. 13-16.

### B.    Defendant's Arguments

In response, the Commissioner argues that the ALJ properly analyzed Kelly's back pain in the sequential evaluation process.  Doc. 21, pp. 11-16.  More specifically, the Commissioner asserts that, since the ALJ considered evidence regarding Plaintiff's back pain at subsequent steps of the sequential evaluation process, the ALJ did not err at Step Two by not finding her back impairment to be severe.  Doc. 21, pp. 11-12.  The Commissioner argues that, even though the ALJ did not specifically discuss Listing 1.04(C), the error, if any, at Step Three is harmless because the record demonstrates that Plaintiff's impairments do not meet or equal Listing

1.04(C).  Doc.  21, pp. 12-15.  The Commissioner argues that, at Step Four, the ALJ clearly

considered Plaintiff's back pain.  Doc. 21, pp. 15-16.

The Commissioner also argues that the ALJ's credibility analysis is not simply

boilerplate but, rather, it is proper and supported by substantial evidence.  Doc. 21, pp. 6-11.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence,

nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.  The ALJ did consider Plaintiff's lumbar spine impairment and back pain and therefore did not err at Step Two, Three or Four of the sequential evaluation process.**

**1.  *Step Two Analysis***

Plaintiff asserts that the ALJ erred by not finding that her lumbar back impairment and

pain were severe impairments at Step Two.  Doc. 19, pp. 9-10.  However, the ALJ found that

Kelly suffered from severe impairments at Step Two,[8] proceeded with subsequent steps in the

sequential analysis, and considered Kelly's alleged impairments in establishing Kelly's RFC.  Tr.

13-21.  Thus, the ALJ did not err at Step Two by not finding Kelly's lumbar back impairment

and resulting pain to be severe impairments. *See Maziarz v. Sec'y of Health & Human Servs.,* 837

---

[8] Multiple bulging discs of the cervical spine, multiple sclerosis, obesity and depression.  Tr. 13.

F.2d 240, 244 (6th Cir.1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process during which the Commissioner properly could consider the cervical condition when determining whether the claimant retained sufficient RFC to allow him to perform substantial gainful activity.)

**2.  *Step Three Analysis***

"[I]t is the claimant's burden to show that he meets or medically equals an impairment in the Listings." *Todd v. Astrue*, 2012 WL 2576435, * 9 (N.D. Ohio 2012) (internal citations omitted).  Relying on *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411 (6th Cir. 2011), Plaintiff asserts that the ALJ erred at Step Three because the ALJ did not specifically address her back impairment under Listing 1.04(C).[9]  Doc. 19, pp. 10-11.  In *Reynolds*, the ALJ made a conclusory statement that the claimant's mental and physical impairments did not meet or equal a Listing and proceeded to discuss, in detail, only the claimant's mental impairments, not the claimant's physical impairments.  *Reynolds*, 424 Fed. Appx. at 415.  *Reynolds* ultimately determined that the ALJ's Step Three evaluation was insufficient because an evaluation of the evidence was necessary to facilitate meaningful judicial review.  424 Fed. Appx. at 416.  (citing *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

Here, the ALJ did discuss evidence and explain why he found Kelly not disabled at Step Three.  Tr. 14-15.  In contrast to the ALJ in *Reynolds,* the ALJ here discussed both physical and mental impairments at Step Three.  Tr. 14-15.  When discussing Kelly's impairments at Step Three, the ALJ specifically mentioned Listing 1.02, which, like Listing 1.04, involves disorders

---

[9] Listing 1.04(C) pertains to:

Disorders of the spine . . ., resulting in compromise of nerve root . . . or the spinal cord.  With . . . [l]umbar spine stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00B2b.

of the musculoskeletal system.  Section 1.00 of 20 C.F.R. pt. 404, Subpt. P, App. 1.  Further, because the ALJ's decision including his Step Four analysis provides sufficient information to determine that no reasonable administrative fact finder would have resolved the matter differently, the undersigned finds that the ALJ's failure to specifically mention Listing 1.04(C) at Step Three is harmless error.  *See Fischer-Ross v. Barnhart*, 4341 F.3d 729, 733 (10th Cir. 2005) (finding that *Clifton* did not categorically reject the application of harmless error analysis in the context of a step three finding); *Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339, *10 (N.D. Ohio 2011); *see also Malone v. Comm'r of Soc. Sec.*, 2011 WL 5520292, *1-3 (N.D. Ohio 2011).

At Step Four, the ALJ gave considerable weight to the opinion of the medical expert, Herschel Goren, M.D.  Tr. 19.  Dr. Goren's testimony included, in part, his opinion as to whether or not Kelly's impairments or combination of impairments met *or* equaled a Listing.  Tr. 47-48; Doc. 19, p. 4.  In particular, upon consideration of Kelly's cervical and lumbar back impairments under Listing 1.04 and, following questions posed by the ALJ, Dr. Goren opined that the severity of her impairments did not meet *or* equal any of the Listings.  Tr. 47-48.  In addition to giving considerable weight to the opinion of Dr. Goren, the ALJ noted that no treating source referred to Kelly as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertion.  Tr. 18.  Also, the ALJ gave weight to the state agency non-examining physicians supporting findings of no disability.  Tr. 19.

While the ALJ's discussion and analysis of the evidence and medical opinions is not contained entirely within her Step Three section, upon a review of the entire decision and evidence, the undersigned finds that the ALJ's conclusion that Kelly's impairments or combination of impairments do not meet or equal a Listing is supported by substantial evidence

17

and that no reasonable administrative fact finder would have resolved the matter differently. Thus, the lack of specific reference to Listing 1.04(C) is harmless.  *Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339, *10-11 (N.D. Ohio 2011)(applying harmless error where an ALJ did not specifically reference a claimant's medical condition when addressing the Listings but did so when analyzing the RFC); *see also Malone v. Comm'r of Soc. Sec.*, 2011 WL 5520292, *1-3 (N.D. Ohio 2011)(finding that, based on a review of the ALJ's decision as a whole, remand was not necessary even though the ALJ's decision contained only a conclusory statement regarding Step Three).

Plaintiff does not directly challenge the ALJ's findings relative to the opinion evidence or lack thereof.  Rather, Plaintiff attempts to argue that the evidence establishes that her impairments meet or equal Listing 1.04(C).  Even if Plaintiff can show that there is evidence to support her position, the undersigned finds that there is substantial evidence to support the ALJ's finding that Kelly's impairments or combination of impairments do not satisfy a Listing.  Thus, reversal is not warranted.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).

Nevertheless, the undersigned will address Plaintiff's argument that her impairments do in fact meet or equal Listing 1.04(C).   First, one of the criteria under Listing 1.04(C) is spinal stenosis and, as acknowledged by the ALJ, one of Plaintiff's MRIs showed mild central spinal stenosis of the lumbar spine.  Tr. 17.  Plaintiff argues that, even though her spinal stenosis is only "mild," she can still satisfy Listing 1.04(C) because the degree of stenosis is not determinative. Doc. 19, pp. 10-11; Doc. 25, p. 2.   Even if Plaintiff is correct, another criteria in Listing 1.04(C)

is the inability of a claimant to ambulate effectively.  To demonstrate that she meets or equals this part of Listing 1.04(C), Plaintiff states that she "testified to falling frequently, using a cane to ambulate, and that her doctors have noted the pain and numbness she experiences in her leg, bilaterally." Doc. 19, p. 11.   As discussed in greater detail in the section addressing the ALJ's credibility analysis, the ALJ considered the Plaintiff's statements and found her statements to be less than credible.  Tr. 15-19.  As part of her credibility analysis, the ALJ found that Kelly was capable of assisting family members with many responsibilities, and that Plaintiff visited family and friends, performed housework, tried to go outside daily and, as recently as February 2011, traveled to Florida.  Tr. 18.   The ALJ noted that Plaintiff's treatment for pain was conservative. Tr. 16.  Further, although Plaintiff testified to falling, she indicated that no medical attention had been required for a recent fall. Tr. 67.  Also, doctor and/or emergency room records reflect that Plaintiff's gait was within normal limits and she was able to ambulate without the use of assistive devices.  Tr.  608-609, 658, 661-662, 787, 778-779

The evidence relied upon by Plaintiff in seeking reversal based upon the ALJ's Step Three findings has been shown to be less than credible and/or is unsupported by objective medical evidence.  Further, as discussed herein, the ALJ's decision, as a whole, contains sufficient information and analysis to allow this Court to conduct a meaningful judicial review and to conclude that the ALJ's Step Three findings are supported by substantial evidence.  Thus, Plaintiff's request that this Court overturn the Commissioner's decision based on the ALJ's Step Three findings is unpersuasive and without merit.

### 3.  *Step Four Analysis*

Plaintiff argues that, because it is unclear whether or not the RFC accounted for limitations resulting from Kelly's back impairment and pain, the ALJ erred at Step Four.  Doc.

19, pp. 12-13.  Contrary to Plaintiff's assertion, it is more than clear that the ALJ considered and accounted for Plaintiff's back impairments and allegations of pain in the RFC.  Tr. 15.  In the RFC itself, the ALJ stated "[b]ecause of her body habitus, back pain and limitations from MS, she can lift and carry . . . ."  Tr. 15.   The ALJ also stated, in the RFC, that "she cannot work in a job that exposes her to hazards such as unprotected heights, because obesity and back pain would make it difficult to . . . ."  Tr. 15.  Further, the ALJ discussed the various tests, including MRIs showing lumbar spine stenosis and bulging discs (Tr. 17) as well as the conservative treatment that Plaintiff received for her pain (Tr. 16).  Additionally, when weighing Dr. Goren's medical opinion, the ALJ determined that, although Dr. Goren opined that there would be no restrictions on sitting, standing, and walking, the objective evidence would be consistent with sitting, standing, and walking for six hours in an eight-hour workday and consistent with the Social Security Administration's definition of light work activity.  Tr. 19.  The foregoing makes clear that the ALJ fully considered and accounted for Plaintiff's back impairments and complaints of pain.

Having reviewed the ALJ's decision, the undersigned finds that Plaintiff's claims that the ALJ did not properly consider her back impairment and back pain when proceeding with each Step of the sequential evaluation process are unpersuasive and not a basis for reversal and remand.

**B.    The ALJ conducted a proper credibility assessment that is supported by substantial evidence.**

Social Security Ruling 96–7p and 20 C.F.R. § 416.929 describes a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the

ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work. When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 3 (July 2, 1996). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." Calvin v. Comm'r of Soc. Sec., 437 F. Appx. 370, 371 (6th Cir. 2011) (citing Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997)).

In reliance upon *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), Plaintiff claims that the ALJ's decision is flawed because the language used by the ALJ when determining Kelly's credibility is simply "template" language that gives the impression that the ALJ first determined the RFC and then determined the Plaintiff's credibility. Doc. 19, pp. 15-16. However, the undersigned concludes that, although the ALJ's decision may include "template" language as part of its credibility analysis, Plaintiff's reliance upon *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012) is misplaced because the ALJ here did explain his credibility determination and that determination is supported by substantial evidence in the record. *See Jones v. Comm'r of Soc.*

*Sec.*, 2012 WL 5378850, * 7 (S.D. Ohio October 30, 2012) (citing *Williams v. Astrue*, 2012 WL 4364147 (S.D. Ohio September 24, 2012) (because the ALJ had adequately explained his credibility determination and because that credibility determination was supported by substantial evidence the inclusion of "template" language, similar to that used in *Bjornson*, was harmless). When she concluded that Kelly's allegations as to the severity of her symptoms were not credible to the extent that her statements were inconsistent with the RFC, the ALJ considered the case record and conducted a thorough credibility analysis. Tr. 16-19.  For example, when she assessed Kelly's credibility, the ALJ considered the Plaintiff's activities of daily living, including providing assistance to her parents and other family members, among them her mentally retarded aunt, performing general housework and cooking, shopping, traveling to Florida, and visiting with friends and family.[10]  Tr. 17, 18, 75, 239-246, 615, 821-829.  The ALJ also considered the fact that Plaintiff had generally been receiving conservative treatment with narcotic pain medication and an epidural injection in 2008.  Tr. 16.  As an additional factor in her credibility determination, the ALJ concluded that the records demonstrate drug-seeking behavior by Kelly and, in reaching this conclusion, she considered Kelly's treatment records that show multiple requests for pain medication refills shortly after having received refills from Dr. Piszel, her pain management treating physician as well as treatment records showing that Kelly was treated for symptoms of narcotics withdrawal.  Tr. 18.   The ALJ also considered objective MRI evidence showing only mild central spinal stenosis.  Tr. 17.  Further, when assessing Kelly's credibility, the ALJ considered the opinion evidence, or lack thereof, of physicians.  Tr. 18-19.  More specifically, she noted that no treating source had described Kelly as having incapacitating or debilitating symptoms that would prevent her from returning to work in any capacity whatsoever.

---

[10] Plaintiff testified that her mother had moved in with her sister but she also testified that her mother still stays with her for a couple days at a time.  Tr. 80-81.

Tr. 18.  She also considered and gave considerable weight to Dr. Goren's medical expert testimony and some weight to the state agency reviewing physicians' findings reflecting no disability.  Tr. 19.

The ALJ's analysis of the evidence is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and whether that determination is supported by substantial evidence.  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 4.   Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's thoroughly reasoned credibility analysis regarding the severity of Kelly's impairments is supported by substantial evidence.  Thus, Plaintiff's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment is unpersuasive and without merit.

### VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated:  January 3, 2013

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).